## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

IN RE:
 BACK9NETWORK, INC., et al.[1] )
 Debtors. )
  )
  (Employer ID # -3858) ) CHAPTER 11
************************************ )
IN RE: )
 BACK9NETWORK, INC., et al. ) CASE NO.:
  )
  Movants )
  ) DECEMBER 23, 2015
V. )
  )
 THE STATE OF CONNECTICUT )
 DEPARTMENT OF ECONOMIC )
 AND COMMUNITY DEVELOPMENT )
 AND GOLFWORKS LLC )
  )
  Respondents )

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 362, 363, AND 364 AND BANKRUPTCY RULES 4001 AND 9014 FOR A PRELIMINARY AND FINAL ORDER TO OBTAIN POST-PETITION FINANCING, GRANTING PRIMING LIENS AND SUPER-PRIORITY CLAIMS, MODIFYING THE AUTOMATIC STAY, AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL, AND GRANTING RELATED RELIEF**

Back9Network, Inc. ("Back9") and Swing by Swing Golf, Inc. ("Swing by Swing" and

together with Back9, the "Debtors") hereby move, pursuant to Sections 105, 361, 362, 363, and

364 of the United States Bankruptcy Code (the "Bankruptcy Code") and Rules 4001 and 9014 of

the United States Bankruptcy Rules (the "Bankruptcy Rules") for a preliminary order (the

"Order") and final order (the "Final Order") in substantially the same form as the Order: (i)

---

[1] The Debtors in these cases are Back9Network, Inc. and Swing by Swing Golf, Inc. (Employee ID #4455).

authorizing the Debtors to obtain post-petition senior secured financing (the "DIP Loan") from

GolfWorks LLC (the "DIP Lender") in accordance with the terms and conditions set forth herein

and in the attached loan documents filed as Exhibit A herewith including the Loan and Security

Agreement (the "Loan Agreement") (collectively, the "DIP Loan Documents"); (ii) authorizing

the Debtors to borrow from the DIP Lender in accordance with the Loan Agreement; (iii)

granting the DIP Lender a post-petition super priority administrative expense claim and first

priority security interest in all of the Debtors' assets (excluding Avoidance Actions as defined

below) as security for the Debtors' obligations pursuant to the DIP Loan; (iv) lifting the

automatic stay to allow the DIP Lender to record and perfect its DIP Loan Documents; (v)

authorizing the Debtors to use cash collateral and provide a replacement lien to the Debtors' only

pre-petition secured creditor, the State of Connecticut Department of Economic and Community

Development ("DECD"); and (vi) granting related relief.

Pursuant to Bankruptcy Rule 4001(c)(1)(B), the Debtors provide the following concise

statement of the terms of the DIP Loan:

a.   The DIP Loan will be a line of credit in an aggregate amount not to exceed
     $2,000,000. See Loan Agreement, §1.1; Order, §4.

b.   The DIP Lender will be GolfWorks LLC. See Loan Agreement; Order.

c.   The DIP Loan will be used to fund the Debtors' working capital needs consistent
     with the budget and interim budget approved by the DIP Lender and DECD (the
     "Budget") and attached to the Order as Exhibit B. See Loan Agreement, §1.1;
     Order, §J. A significant portion of the proceeds of the DIP Loan are also expected
     to be used to fund the Debtors' proposed plan of reorganization. Id.

2

d.  Under the Loan Agreement and the Order, the Debtors covenant to file a disclosure statement and a plan of reorganization acceptable to the DIP Lender and DECD on or before February 1, 2016. See Loan Agreement, §6.11; Order, §23.

e.  The maturity date of the DIP Loan is March 31, 2016. See Loan Agreement, §1.2.

f.  Interest under the DIP Loan is 6% per annum, with default interest of an additional 6% per annum. See Loan Agreement, §§1.3 and 3.4.

g.  The DIP Loan has an origination fee of two points.  See Loan Agreement, §3.5.

h.  There is a carve out (the "Carve Out") under the DIP Loan for the following: (i) all allowed administrative fees and reimbursements for disbursements of professionals retained by the Debtors; (ii) all allowed administrative fees and reimbursements for disbursement of professionals retained by any statutory committee of unsecured creditors appointed in these cases in an aggregate amount not to exceed $50,000; and (iii) quarterly fees pursuant to 11 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court. See Loan Agreement, §5.12; Order, §24.

i.  The DIP Loan will be (i) entitled to super priority administrative expense claim status pursuant to Section 364(c)(1) of the Bankruptcy Code, subject only to the Carve Out; and (ii) secured by a senior first priority security interest in and liens upon all presently owned and hereafter acquired assets of the Debtors (excluding avoidance actions arising under Chapter 5 of the Bankruptcy Code ("Avoidance Actions")) pursuant to Section 364(d) of the Bankruptcy Code, subject only to the Carve Out. See Loan Agreement, §§2.1 and 2.2; Order §§ 7 and 8.

3

j.   DECD, the Debtors' only pre-petition secured creditor, has consented to the DIP
Loan and will receive as adequate protection a lien on all presently owned and
hereafter acquired assets of the Debtors (excluding Avoidance Actions) as
adequate protection under Section 364(d)(1)(B) of the Bankruptcy Code, which
lien will have the same validity, enforceability, and priority as the liens of DECD
as of the Petition Date (as defined below). See Order, §13. The Order does not
determine the validity, enforceability, priority, or amount of DECD's liens and
claims as of the Petition Date although the Debtors stipulate to the same without
prejudice to the rights of any other party in interest to challenge or dispute the
same. See Order, §D.

k.   The Debtors will make customary affirmative and negative covenants. See Loan
Agreement, §6.

l.   The Order shall be evidence of the validity, enforceability, perfection, and priority
of the liens arising from the DIP Loan Documents without necessity of filing or
recording any financing statements or other instruments. See Order, §13. The
automatic stay is modified solely to permit the DIP Lender to record and perfect
its liens and to enter into the DIP Loan. See Order, §13. Upon any default under
the DIP Loan, the DIP Lender must seek relief from the automatic stay in order to
exercise its rights under the DIP Loan Documents, and the Debtors agree not to
oppose an expedited hearing on any motion for relief from the automatic stay. See
Order, §20.

m.  The DIP Loan is subject to customary events of default. See Loan Agreement, §7.

4

n.  The closing and disbursement of the DIP Loan is subject to customary conditions. See Loan Agreement, §4.

o.  The Debtors are responsible to pay all costs and expenses incurred by the DIP Lender in connection with the DIP Loan. See Loan Agreement, §4.1(b).

p.  The Debtors shall indemnify the DIP Lender for any loss, liability, damages, and costs of any kind relating to or arising directly or indirectly out of the DIP Loan. See Loan Agreement, §8.7.

q.  The DIP Loan is not subject to Section 506(c) of the Bankruptcy Code. See Order, §7.

r.  The DIP Loan does not make provision for any of the matters listed in Bankruptcy Rule 4001(c)(1)(B)(viii).

In further support of this Motion, the Debtors respectfully state as follows:

1.  On December 23, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. In accordance with Sections 1107 and 1108 of the Bankruptcy Code, the Debtors are authorized to continue in possession of their properties and operate and manage their businesses as debtors-in-possession. No trustee or examiner has been appointed in these proceedings.

2.  Back9 was founded and incorporated in July, 2010 by a small group of golf industry executives for the purpose of building a premier golf lifestyle and entertainment 24/7-television network and digital media company.

3.  Back9 located its headquarters and operations in Hartford, Connecticut because of the State of Connecticut's attractive media tax credit programs and the local availability of qualified and talented employees for its television network.

4.      On or about February 3, 2012, Back9 filed an application with DECD requesting

financial loans and assistance for the start-up of Back9's television golf network. DECD

approved Back9's application, and on May 11, 2012, Back9 and DECD entered into certain

agreements (the "SBA Express Agreements") pursuant to which DECD agreed to extend a

grant in an amount not to exceed $100,000 and a loan in an amount not to exceed $250,000 to

Back9. Back9's obligations under the SBA Express Agreements were evidenced by a

promissory note (the "$250,000 Note") in the principal amount of $250,000 dated May 11,

2012 and secured by a security agreement dated May 11, 2012. DECD's security interest was

perfected by a UCC financing statement dated June 1, 2012 and recorded at UCC1 File

Number 20122110346.

5.      As of the Petition Date, the balance due to DECD under the $250,000 Note was

$24,048.94.

6.      On August 15, 2012, DECD agreed to extend additional financial assistance to Back9

in the form of a loan in an amount not to exceed $750,000 (the "Assistance Agreement").

Back9's obligations under the Assistance Agreement were evidenced by a promissory note in

the amount of $750,000 (the "$750,000 Note") and secured by an intellectual property

security agreement and a security agreement both dated August 15, 2012. DECD's security

interest was perfected by a UCC financing statement dated August 22, 2012 and recorded at

UCC1 File Number 20123243699.

7.      On February 21, 2013, DECD and Back9 entered into an amendment to the

Assistance Agreement, pursuant to which DECD agreed to extend an additional loan in the

amount of $4,000,000 to assist Back9 with the second phase of Back9's business project (the

"Amended Assistance Agreement"). Back9's additional obligations under the Amended

6

Assistance Agreement were evidenced by a promissory note in the amount of $4,000,000 (the "$4,000,000 Note") and secured by an amended and restated security agreement and an amended and restated intellectual property agreement both dated February 21, 2013. DECD's security interest was perfected by the UCC financing statement dated August 22, 2012 and recorded at UCC1 File Number 20123243699.

8.      As of the Petition Date, the balance due to DECD under the $750,000 Note was $750,000 and the balance due to DECD under the $4,000,000 Note was $4,000,000.

9.      The Debtors stipulate to the validity, priority, enforceability, and perfection of the various liens held by DECD as of the Petition Date (the "DECD Liens") in connection with the $250,000 Note, the $750,000 Note, and the $4,000,000 Note (collectively, the "DECD Notes"). The Debtors further stipulate to the enforceability of the DECD Notes without any defense or offset.

10.     In the four years following its founding in 2010, Back9 also raised $32 million of preferred equity from over 200 individual, accredited investors. This equity was raised via series A, B and C fundraising rounds, closing in March 2012, May 2013, and August 2014, respectively.

11.     Back9, since September 2014, also raised approximately $6.2 million of unsecured convertible notes from its existing investor base.

12.     Back9 used the capital and loan funds to produce online and television programming, renovate and locate its headquarters and production facilities in downtown Hartford, maintain media operations and employ, at one point, more than eighty fulltime employees.

13.     On or about May 30, 2014, Back9 also acquired 100% of the stock of Swing by Swing. The purchase price was $1 million, plus 200,000 shares of Back9 common stock.

7

14. Swing by Swing was acquired to promote and develop the mobile application business of the same name (the "Golf Application") in conjunction with marketing and driving audience awareness of Back9's content.

15. Despite intense efforts to generate additional advertising revenue, raise long term capital, and secure additional television distribution, Back9 ultimately was forced to discontinue its television operations on February 23, 2015. Due to the increasing consolidation within the U.S. pay television distribution industry and the deceleration of U.S. pay television household growth, Back9 was not able to attract the long-term financing needed to grow and operate a 24/7 U.S. cable network.

16. Contemporaneously with the cessation of Back9's television operations, Back9 was forced to lay off all of its employees, with the exception of a small group of senior executives who remained and took no salaries for an extended period of time as they worked on restructuring the Debtors. As of the Petition Date, Back9 has only two remaining senior executives, each of whom[2] has been paid only $80,000 over the past thirteen months as they worked to restructure the Debtors.

17. As part of this restructuring effort, beginning in March, 2015, Cardinal Advisors, LLC ("Cardinal"), the Debtors' financial advisor, reached out to over ninety financial and strategic investors to explore a revamp of the Debtors' businesses.

18. In April, 2015, Back9's board of directors signed a letter of intent with a California-based private equity firm, which proposed to purchase the Debtors' assets and restructure the Debtors' liabilities outside of a bankruptcy process.

---

[2] The two executives are Charles Cox and Reid Gorman, chief executive officer and chief revenue officer respectively.

8

19.     In July, 2015, DECD determined that in order to best protect its interests, it could not accept this letter of intent because it believed that any restructuring of the Debtors needed to be pursued through a Chapter 11 bankruptcy process.

20.     As a result, between July and September, 2015, Cardinal again reached out to numerous financial and strategic investors to explore interest in investing in the Debtors' businesses through a Chapter 11 bankruptcy process.

21.     As a result, the Debtors have identified a group of existing investors (the "Investor Group") that is prepared to invest $2,000,000 in the Debtors for the purpose of funding both post-petition operations and a restructuring pursuant to a plan of reorganization. Significantly, the Investor Group was the only entity willing to submit a letter of intent to invest in the Debtors.

22.     The Investor Group consists of five individuals, each of whom is an equity security holder and a convertible note holder in Back9.[3] For purposes of funding the DIP Loan, the Investor Group has formed a limited liability company that will be the DIP Lender.

23.     Upon the granting of the Order at a preliminary hearing, the Debtors will draw an amount, as set forth in the Budget, that is necessary to avoid immediate and irreparable harm to the Debtors' estates pending a final hearing in accordance with Bankruptcy Rule 4001(c)(2). Upon the approval of the DIP Loan at the Final Hearing, the Debtors will draw an additional amount as set forth in the Budget. The total draw under the Budget will be in the approximate of $500,000 to fund working capital and professional services related to the bankruptcy from the Petition Date through March 31, 2016. In addition, the Debtors intend to draw the balance of the DIP Loan, or $1,500,000, in order to fund the Debtors' plan of

---

[3] The five members of the Investor Group are: Brian Furbish, Karl Krapek, Denis Nayden, Ted Rossi, and Paul Raether.

9

reorganization. This draw will be subject to approval of the plan of reorganization by the

Court and the DIP Lender. Significantly, the DIP Lender is then prepared to convert the entire

balance of the DIP Loan into a post-confirmation loan to the Debtors that is *pari passu* with

the DECD Notes in exchange for a majority interest in the reorganized Debtors.

24.      Consistent with the covenant in the Loan Agreement, the Debtors intend to file a plan

of reorganization in this case shortly after the Petition Date based on significant negotiations

that have taken place pre-petition. The proposed plan will be based on the digital platform

that the Debtors have developed.  Specifically, despite failing to create a profitable television

network, the Debtors have succeeded in forming a compelling online platform consisting of

widely-used online websites, the Golf Application and an email newsletter with a subscriber

base of 1.7 million users (the "Digital Platform"). Among other things, the Digital Platform

will leverage and grow the digital media assets and the audience built by Back9 and Swing by

Swing.

25.      The Debtors believe that the Digital Platform can be enhanced and grown in part

because the Golf Application has been downloaded over 3 million times and provides GPS

mapping for 35,000-plus golf courses in 130 countries. The Golf Application is used for

hundreds of thousands of rounds each month and also serves as a source of golf entertainment

content and social media interaction for its users.

26.      The development of the Digital Platform has allowed the Debtors to generate positive

operating income since April, 2015[4] even though the Debtors have had no working capital

available to hire full-time employees or to otherwise market and expand the Digital Platform.

---

[4] The willingness of the remaining two senior executives to work for little or no salary allowed the Debtors to
survive during this period.

27.    Without securing a post-petition source of capital, the Debtors will be unable to

continue to operate, maintain, and promote the Digital Platform and will be unable to execute

the intended expansion and restructuring.

28.    The Debtors intend to use the initial proceeds of the DIP Loan to expand the Digital

Platform by hiring additional employees and by increasing sales and marketing efforts, all

with the goal of having an improved and expanded Digital Platform when the golf season

begins again next spring. The Debtors intend to pursue these growth objectives while

retaining its principal place of business in Connecticut.

29.    A debtor seeking permission to obtain borrowing under Section 364(c) must establish

that (1) the debtor cannot obtain credit unencumbered or without superpriority status under

Section 364(b), (2) the loan is necessary to preserve the assets of the estate, and (3) the terms

of the transactions are fair, reasonable and adequate, given the circumstances of the debtor-in-

possession and the proposed lender. *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312

(Bankr. D. Del. 2011).

30.    A debtor seeking permission to obtain borrowing under Section 364(d) must establish

that the debtor cannot establish credit otherwise and that any entity that is primed is

adequately protected or has consented. 11 U.S.C. §364(d).

31.    Here, the Debtors cannot obtain a loan unless the loan is senior to all existing

creditors. Moreover, the loan is necessary to continue the Debtors' operations and develop the

Digital Platform. Without procuring the DIP Loan, the Debtor will be unable to expand the

Digital Platform and pursue the restructuring and very likely will be forced to liquidate to the

detriment of all creditors including DECD. Significantly, to provide the Debtors with the

opportunity to reorganize and avoid liquidation, DECD has consented to the terms of the DIP

Loan under Section 364(d) provided that the Debtors provide a lien (the "Adequate Protection

Lien") to DECD on all presently owned and hereafter acquired assets of the Debtors

(excluding Avoidance Actions) as adequate protection under Section 364(d)(1)(B) of the

Bankruptcy Code, which Adequate Protection Lien will have the same validity,

enforceability, and priority as the DECD Liens as of the Petition Date (subject to and

subordinate to the liens of the DIP Loan).

32.     The Debtors' intended plan of reorganization will assume the DECD Notes in full and

represents the best way for DECD and other creditors of the Debtors to recover on their

claims. Indeed, given the significant pre-petition efforts of Cardinal and the Debtors to locate

possible investors and given that the Investor Group is the only group that has stepped

forward in response to those efforts, the Debtors believe that the Motion and the proposed

plan of reorganization provide the only reasonable basis to restructure the Debtors' operations

and provide a return to creditors.

33.     In the Debtors' business judgment, the terms of the DIP Loan are commercially

reasonable for debtor in possession financing. The Debtors respectfully submit that it is in the

best interests of the estate to approve the Motion as requested herein.

34.     The Debtors have negotiated the terms of the DIP Loan with the DIP Lender in good

faith and in an arms-length transaction. The terms of the DIP Loan are at least as favorable as

those available to the Debtors from other sources. The credit extended to the Debtors by the

DIP Lender under the DIP Loan should be deemed to be extended in "good faith" as that term

is used in Section 364(e) of the Bankruptcy Code and in express reliance upon the protections

set forth therein.

12

35.      Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), the Debtors request that (a) this

Court hold an interim hearing and thereafter enter the proposed Order authorizing the

Debtors, during the period between the Order and the Final Order (the "Interim Period"), to

obtain an initial disbursement of a portion of the DIP Loan proceeds for the purposes

specified in the Budget as applicable to the Interim Period and (b) this Court subsequently

hold a final hearing and thereafter enter an order substantially in the form of the proposed

Order authorizing the Debtors, after the Interim Period, to obtain disbursements of the DIP

Loan proceeds in accordance with the Budget.

36.      The Debtors also propose to use the cash collateral of DECD.  As of the Petition Date,

the amount of cash collateral was under $30,000 and DECD has consented to the use of cash

collateral provided that the Debtors provide DECD with a replacement lien (the

"Replacement Lien") on all presently owned and hereafter acquired assets of the Debtors

(excluding Avoidance Actions) as adequate protection for the use of cash collateral under

Section 363 of the Bankruptcy Code, which Replacement Lien shall have the same validity,

enforceability, and priority as the DECD Liens as of the Petition Date (subject to and

subordinate to the liens of the DIP Loan).

37.     Notice of this Motion has been given to the United States Trustee, counsel for DECD,

counsel for the DIP Lender, the twenty largest creditors, and the twenty largest holders of

convertible promissory notes of Back9.

DEBTORS

BACK9NETWORK, INC. AND SWING BY
SWING GOLF, INC.

By /s/ *William S. Fish, Jr.*
William S. Fish, Jr.
Federal Bar No. ct05439
Thomas J. Farrell
Federal Bar No. ct00861
Hinckley, Allen & Snyder LLP
20 Church Street, 18th Floor
Hartford, CT 06103
860-725-6200
wfish@hinckleyallen.com
tfarrell@hinkleyallen.com

14

**Loan and Security Agreement**

This Loan and Security Agreement ("Agreement"), dated effective as of January __, 2016, is by and among GolfWorks LLC (the "Lender") and Back9Network, Inc., a Delaware corporation and Debtor-in-Possession under Chapter 11 of the United States Bankruptcy Code, and Swing by Swing Golf, Inc., a Delaware corporation and Debtor-in-Possession under Chapter 11 of the United States Bankruptcy Code, (collectively, the "Debtors").

**RECITALS**

1.      On December 23, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Connecticut (the "Court"), Case No. [  ] (the "Chapter 11 Cases"). In accordance with Sections 1107 and 1108 of the Bankruptcy Code, the Debtors are authorized to continue in possession of their properties and operate and manage their businesses as debtors-in-possession.

2.      The Lender is a good-faith, third party lender and is willing to lend the Debtors the sum of up to $2,000,000.00 to provide the Debtors necessary funds required for working capital and other purposes, provided that the Debtors are able to obtain Court approval for a post-petition debtor-in-possession loan on terms acceptable to the Lender pursuant to Bankruptcy Code Sections 105, 362 and 364 and Bankruptcy Rules 4001 and 9014: (i) authorizing the Debtors to obtain post-petition secured financing in accordance with the terms and conditions set forth in this Agreement and the documents executed or delivered in connection herewith (the "Loan Documents"); (ii) granting the Lender a post-petition super priority administrative expense claim and first priority security interest on the Collateral (as defined herein); (iii) lifting the automatic stay to allow the Lender to record and perfect certain Loan Documents; and (iv) granting related relief (hereinafter, the "Financing Order").

3.      Subject to Court approval and entry of the Financing Order and subject to the terms and conditions set forth in this Agreement, the Lender is willing to make the loan described in this Agreement.

**Now therefore**, in consideration of the mutual terms and conditions set forth herein, the Debtors and the Lender agree as follows:

| 1. | THE LOAN |
|---|---|

**1.1     Loan Amount and Purpose.** Subject to the terms and conditions set forth in this Agreement, the Lender agrees to advance to the Debtors a loan in the principal amount of up to TWO MILLION DOLLARS ($2,000,000.00) (the "Loan"). The Loan will be disbursed, during the availability period described in Section 1.2, in accordance with the procedures set forth in Section 1.2. The proceeds of the Loan will be used by the

Debtors in accordance with the budget attached to the Financing Order as Exhibit A (the "Budget"). Any advance or disbursement of Loan proceeds under this facility that is made and repaid may not be reborrowed.

**1.2   Availability Period.**

(a)   The Loan is available in one or more disbursements during the period commencing after satisfaction (or waiver by Lender) of the conditions to the initial disbursement set forth in Section 4 of this Agreement and ending on the earlier of (i) the entry of an order confirming a Chapter 11 plan of reorganization or liquidation in the Chapter 11 Case, and (ii) March 31, 2016 (such date, the "Maturity Date").

(b)   The Debtors may request disbursements of the Loan by delivering to Lender a written borrowing request stating the amount of the Loan requested (a "Borrowing Request") two (2) business days prior to the date on which such disbursements are requested. Each disbursement made hereunder shall be made to an account of the Debtors designated in the Borrowing Request.

**1.3   Interest.** The interest rate will be a fixed rate per year equal to 6.00% and will accrue on the full principal amount of the Loan advanced and outstanding from time to time hereunder.

**1.4   Repayment Terms.** The Debtors will pay interest and principal in accordance with the terms of a promissory note in the form attached hereto as Exhibit A (the "Note").

**1.5   Prepayments.** The Debtors may prepay the Loan in full or in part at any time during the term of the Note without the payment of a prepayment fee or premium.

**1.6   Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender from Debtors under the Loan shall be applied by Lender in the following order of priority: (i) amounts required to be payable for taxes and insurance by Debtors in connection with the Loan; (ii) late charges payable under the Note; (iii) interest payable on the Note; (iv) principal of the Note; (v) interest payable on protective advances made by Lender to cure a default; (vi) principal of protective advances made Lender to cure a default; and (vii) any other sums secured by this Loan in such order as Lender, at Lender's option, may determine; provided, however, that Lender may, at Lender's option, apply any sums payable pursuant to any protective advances made by Lender prior to interest on and principal of the Note, but such application shall not otherwise affect the order of priority of application specified in this Section 1.6.

**2.   COLLATERAL**

**2.1   All Assets of the Debtors.** All obligations of the Debtors under this Agreement and the Note will be secured by a first-priority senior security interest in all assets of the

-2-

Debtors, including, without limitation, all of its Accounts, Inventory, General Intangibles, Documents of Title, Other Collateral, Equipment, As-Extracted Collateral, Chattel Paper, Commercial Tort Claims, Consignments, Copyrights, Copyright licenses, Documents, Instruments, Letter-of-Credit Rights, Letters of Credit, Patents, Patent licenses, Payment Intangibles, Promissory Notes, Software, Supporting Obligations, Trademarks, Trademark licenses, Goods, Investment Property, Fixtures and Records, and to the extent not otherwise included, all Proceeds (including condemnation proceeds), all Accessions and additions thereto, and all substitutions and replacements therefor and products of any and all of the foregoing (the foregoing capitalized terms not defined herein shall have the meanings given to such terms in Article 9 of the Uniform Commercial Code as the same may be amended and in effect from time to time in the State of Connecticut) (collectively, the "Collateral"). The Lender shall be authorized to file all financing statements required to be filed in order to perfect, in favor of the Lender, a first priority security interest in the Collateral.

**2.2     Superpriority Nature of Claims and Lender's Liens.** All obligations of the Debtors under this Agreement and the Note will be further supplemented by superpriority claims against the Debtors as set forth in the Financing Order entered with respect to the Bankruptcy Case.

| **3.** | **PAYMENTS AND COSTS** |
|---|---|

**3.1     Disbursements and Payments.**

(a)     Each payment by the Debtors will be made in U.S. Dollars and immediately available funds, without setoff or counterclaim. Payments will be made by mail to the address shown on the Debtors' statement, or by such other method as may be permitted by the Lender.

(b)     Each disbursement by the Lender and each payment by the Debtors will be evidenced by records kept by the Lender.

**3.2     Banking Day.** Unless otherwise provided in this Agreement, a banking day is a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in the State of Connecticut. All payments and disbursements which would be due on a day which is not a banking day will be due on the next banking day. All payments received on a day which is not a banking day will be applied to the credit on the next banking day.

**3.3     Interest Calculation.** Except as otherwise stated in this Agreement, all interest and fees, if any, will be computed on the basis of a 360-day year and the actual number of days elapsed. Installments of principal which are not paid when due under this Agreement shall continue to bear interest until paid.

**3.4     Default Rate.** Upon the occurrence and during the continuance of any Event of Default or after maturity or after judgment has been rendered on any obligation under

this Agreement, all amounts outstanding under this Agreement, including any unpaid interest, fees, or costs, will at the option of the Lender bear interest at a rate which is 6.0 percentage point(s) higher than the rate of interest otherwise provided under this Agreement (such rate referred to as the "Default Rate").

**3.5     Origination Fee.** The Debtors shall pay a two point origination fee to the Lender upon the closing of the Loan.

## 4.     CONDITIONS TO DISBURSEMENT

The Lender will have no obligation to make disbursements of the Loan until all applicable conditions listed in this Section are satisfied. The Lender, in its sole discretion, may waive one or more of these conditions without affecting its right to fully enforce such condition or conditions with respect to any subsequent request for a disbursement.

**4.1     First Disbursement.** The first disbursement of the Loan (unless otherwise indicated) is subject to the following conditions:

(a)     Loan Documents. Receipt by the Lender of the following documents and other items, executed and acknowledged as appropriate, all in form and substance satisfactory to the Lender:

(i)     this Agreement.

(ii)     a UCC-1 financing statement listing the Debtors as debtors and the Lender as secured party and covering all assets of the Debtors.

(iii)     the Note.

(iv)     Evidence of the insurance coverage required under this Agreement.

(v)     Evidence that the execution, delivery and performance by the Debtors of this Agreement and any instrument or agreement required under this Agreement has been duly authorized.

(vi)     The Court shall have entered the Financing Order, in form and substance that is reasonably satisfactory to the Lender, which has not been reversed, stayed, modified or amended and as to which the time to appeal or to seek certiorari or review has expired and as to which no appeal or petition for certiorari or review is pending or as to which any right to appeal or to seek certiorari or review has been waived.

(vii)     The Lender's receipt of the Budget in form and substance satisfactory to the Lender.

-4-

(b)    Expenses.  Payment by the Debtors of the Lender's costs and expenses incurred in connection with this Agreement.

**4.2    Conditions to All Disbursements.**  All disbursements are subject to each of the following conditions:

(a)    Receipt by the Lender of a Borrowing Request.

(b)    No more than the maximum principal amount of the Loan would be outstanding, after giving effect to such disbursements.

(c)    There must not be any Event of Default under this Agreement or any of the Loan Documents.

(d)    Debtors are in compliance with the Budget.

(e)    The Lender determines in its sole and absolute discretion that the disbursement is in the Lender's interests including a determination that the Debtors will be able to comply with section 6.11, below.

| 5. | REPRESENTATIONS AND WARRANTIES |
|---|---|

The Debtors promise that each representation and warranty set forth below is true, accurate and correct as of the date of this Agreement.  Each draw request will be deemed to be a reaffirmation of each and every representation and warranty made by the Debtors in this Agreement.

**5.1    Formation; Authority.**  The Debtors have complied with all laws and regulations concerning its organization, existence and the transaction of its business, and is in good standing in each state in which it conducts its business.  The Debtors are authorized to execute, deliver and perform its obligations under this Agreement and any documents or agreements required hereunder.

**5.2    No Violation.**  The Debtors are not in violation of, and the terms of this Agreement do not conflict with, any regulation or ordinance, any order of any court or governmental entity, or any covenant or agreement affecting the Debtors.  There are no claims, actions, proceedings or investigations pending or threatened against the Debtors, except for those previously disclosed by the Debtors to the Lender in writing.

**5.3    Good Standing.**  In each state in which the Debtors do business, they are properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

**5.4    Financial and Other Information.**  All financial and other information that has been or will be supplied to the Lender is sufficiently complete to give the Lender

accurate knowledge of the Debtors' financial condition, including all material contingent liabilities.

**5.5    Litigation.** There is no lawsuit, tax claim or other dispute pending or threatened against the Debtors which, if lost, would materially impair the Debtors' financial condition or ability to repay the Loan, except as have been disclosed in writing to the Lender.

**5.6    Insurance.** The Debtors have obtained, and maintained in effect, the insurance coverage required in the "Covenants" section of this Agreement.

**5.7    Other Obligations.** The Debtors are not in default on any material obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as have been disclosed in writing to the Lender.

**5.8    Tax Matters.** The Debtors have no knowledge of any pending assessments or adjustments of its income tax for any year and all taxes due have been paid, except as have been disclosed in writing to the Lender.

**5.9    No Event of Default.** There is no event which is, or with notice or lapse of time or both would be, an Event of Default under this Agreement.

**5.10   Collateral.** All Collateral is owned by the Debtors free of any title defects or any liens or interests of others, except those which have been approved by the Lender in writing or are otherwise expressly contemplated herein.

**5.11   ERISA Plans.**

(a)    Each Plan (other than a multiemployer plan) is in compliance in all material respects with ERISA, the Code and other federal or state law, including all applicable minimum funding standards and there have been no prohibited transactions with respect to any Plan (other than a multiemployer plan), which has resulted or could reasonably be expected to result in a material adverse effect.

(b)    With respect to any Plan subject to Title IV of ERISA:

(i)    No reportable event has occurred under Section 4043(c) of ERISA which requires notice.

(ii)   No action by the Debtors or any ERISA Affiliate to terminate or withdraw from any Plan has been taken and no notice of intent to terminate a Plan has been filed under Section 4041 or 4042 of ERISA.

(c)    The following terms have the meanings indicated for purposes of this Agreement:

(i)     "Code" means the Internal Revenue Code of 1986, as amended.

(ii)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(iii)   "ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Debtors within the meaning of Section 414(b) or (c) of the Code.

(iv)    "Plan" means a plan within the meaning of Section 3(2) of ERISA maintained or contributed to by the Debtors or any ERISA Affiliate, including any multiemployer plan within the meaning of Section 4001(a)(3) of ERISA.

## 5.12   Lien Priority and Survival of Liens and Claims.

(a)     On and after the date of entry of the Financing Order and after giving effect thereto, the provisions of the Loan Documents and Financing Order are effective to create in favor of the Lender, legal, valid and perfected first priority liens on and security interests (pursuant to Sections 364(c)(2) and 364(d) of the Bankruptcy Code) in the Collateral, without the necessity of any party delivering, filing, registering or recording any other financing statements, filings, notices, recordings or other instruments or otherwise taking any other action to perfect such security interests or liens, subject only to the Carve-Out specified in the Financing Order.

(b)     On and after the entry of the Financing Order and after giving effect thereto, all obligations owing by the Debtors will be allowed administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in the Chapter 11 Case having priority over all administrative expenses of the kind specified in sections 503 and 507 of the Bankruptcy Code and any and all expenses and claims of the Debtors, whether heretofore or hereafter incurred, including, but not limited to, the kind specified in sections 105, 326, 328, 506(c), 507(a) or 1114 of the Bankruptcy Code, subject only to the Carve-Out specified in the Financing Order.

(c)     The Debtors agree that the obligations hereunder and under the other Loan Documents, including the Note, shall not be discharged by (i) the entry of an order confirming a Chapter 11 plan of reorganization or liquidation in the Chapter 11 Case (and the Debtors, pursuant to section 1141(d) (4) of the Bankruptcy Code, hereby waives any such discharge), (ii) the conversion of the Chapter 11 Case to a chapter 7 case, or (iii) the dismissal of the Chapter 11 Case. The Debtors agree that the lien and super-priority administrative expense claim granted to the Lender pursuant to the Order shall not be affected in any manner by the entry of an order confirming a Chapter 11 plan of reorganization or liquidation in the Chapter 11 Case.

| 6. | COVENANTS OF DEBTOR |
|---|---|

The Debtors agree, so long as the Loan is available under this Agreement and until the Lender is repaid in full:

**6.1    Use of Proceeds.**   To use the Loan proceeds for the purposes described in Section 1.1 of this Agreement.

**6.2    Performance of Acts.**   Upon request by the Lender, to perform all acts which may be reasonably necessary or advisable to perfect any lien or security interest provided for in this Agreement or to carry out the intent of this Agreement and the Financing Order.

**6.3    Compliance with Law.**   To comply with all existing and future laws, regulations, orders, and requirements of, and all agreements with and commitments to, all governmental, judicial and legal authorities having jurisdiction over the Debtors or their businesses or Collateral.

**6.4    Permits, Licenses and Approvals.**   To properly obtain, comply with and keep in effect all permits, licenses and approvals which are required to be obtained from governmental bodies in order to operate its business. The Debtors will promptly deliver copies of all such permits, licenses and approvals to the Lender.

**6.5    Financial Information.**   To provide financial statements and other information in form and content acceptable to the Lender relating to the affairs of the Debtors as requested by the Lender from time to time.

**6.6    Insurance.**

(a)    To maintain the following insurance:

(i)    Comprehensive general liability coverage with such limits as the Lender may require.   This policy will include an additional insured endorsement in favor of Lender. Coverage will be written on an occurrence basis, not claims made.    Until the Improvements are completed, the Debtors shall also cause the general contractor to maintain such insurance.

(ii)    Workers' compensation insurance for all employees of the Debtors in such amount as is required by law.    Until the improvements are completed, the Debtors shall also cause the general contractor to maintain such insurance.

(iii)    Such other insurance as the Lender in its reasonable judgment may require to comply with the Lender's regular requirements and practices in similar transactions, which may include windstorm, hurricane, and

earthquake insurance, and insurance covering acts of terrorism.

(b)     All policies of insurance required by the Lender must be issued by companies approved by the Lender and otherwise be acceptable to the Lender as to amounts, forms, risk coverages and deductibles.  Upon the request of the Lender, the Debtors will deliver to the Lender a copy of each insurance policy, or, if permitted by the Lender, a certificate of insurance listing all insurance in force.

(c)     If the Debtors fail to keep any such coverage in effect while the Loan is outstanding, the Lender may procure the coverage at the Debtors' expense. The Debtors will reimburse Lender, on demand, for all premiums paid by the Lender, which amounts may be added to the principal balance of the Loan and shall bear interest at the default rate provided in this Agreement.

**6.7     Notices.**  To promptly notify the Lender in writing of:

(a)     Any litigation affecting the Debtors.

(b)     Any notice or communication that the Debtors fail in any material respect to comply with any applicable law, regulation or court order.

(c)     Any substantial dispute between the Debtors and any government authority.

(d)     Any material adverse change in the Debtors' financial condition or operations or other circumstance that adversely affects the Debtors' ability to repay the Loan, or that causes the Loan to be out of balance.

(e)     Any default under this Agreement, or any event which, with notice or lapse of time or both, would constitute an Event of Default.

(f)     Any change in the Debtors' names, legal structures, states of incorporation, places of business, or chief executive offices if the Debtors have more than one place of business.

**6.8     Books and Records.**  To maintain adequate books and records and allow the Lender and its agents to examine, audit and make copies of books and records at any reasonable time.  If any of the Debtors' books or records are in the possession of a third party, the Debtors authorize that third party to permit the Lender or its agents to have access to perform examinations or audits and to respond to the Lender's requests for information concerning such books and records.

**6.9     Other Liens.**  Not to create, assume, or allow any security interest or lien (including judicial liens) on the Collateral except:

(a)     Liens and security interests in favor of the Lender established by and

contemplated by the Financing Order.

(b)     Liens for current taxes, assessments or other governmental charges which are not delinquent or remain payable without any penalty.

(c)     Liens outstanding on the date of this Agreement.

**6.10   Inspection of Collateral.**  To allow the Lender, its agents and representatives to enter and visit the Debtors' business location at any reasonable time, upon reasonable prior notice, for the purposes of inspecting the Collateral.

**6.11   Prompt Filing of Plan.**  To file a plan of reorganization acceptable to Lender in its sole and absolute discretion on or before February 1, 2016.

| 7. | DEFAULT AND REMEDIES |
|---|---|

**7.1   Events of Default.**  The Debtors will be in default under this Agreement upon the occurrence of any one or more of the following (each an "Event of Default"):

(a)     <u>Failure to Pay</u>.  The Debtors fail to make a payment under this Agreement or the Note when due, after giving effect to any applicable cure period.

(b)     <u>Cross-default</u>.  Any event of default occurs, after giving effect to any applicable cure period, under the Note or the other Loan Documents or the Financing Order.

(c)     <u>False Information</u>.   The Debtors have given the Lender false or misleading information or representations.

(d)     <u>Chapter 11 Case</u>.

(i)     The Chapter 11 Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code; a trustee or interim trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a receiver and manager, or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code is appointed in the Chapter 11 Case; or an application is filed by the Debtors for the approval of any superpriority claim or lien (other than the Carve-Out in the Financing Order) in the Chapter 11 Case which is pari passu with or senior to the claims or liens of the Lender hereunder or under the Financing Order.

(ii)     The Debtors fail to comply with any term of the Financing Order or the occurrence of an event of default thereunder.

(iii)     The Financing Order is reversed, stayed for a period in excess of fourteen (14) days, vacated or rescinded; or (ii) amended, supplemented or otherwise modified without the written consent of the Lender.

(iv)     The Debtors shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Court or any other writing to another party-in-interest executed by or on behalf of the Debtors), any other person's motion, to disallow in whole or in part the Lender's claim in respect of the obligations or to challenge the validity, perfection, priority, non-avoidability or enforceability of the liens in favor of the Lender.

(f)     Receivers.   A receiver or similar official is appointed for any portion of the Debtors' assets.

(g)     Lien Priority.   The Lender fails to have a valid and enforceable first priority perfected security interest in or lien on the Collateral or any other collateral securing the Debtors' obligations under this Agreement, the Loan Documents and or the Financing Order.

(h)     Material Adverse Change.   A material adverse change occurs, or is reasonably likely to occur, in the Debtors' business condition (financial or otherwise), operations, properties or prospects, or ability to repay the Loan excluding any change related to the pending Chapter 11 Case.

(i)     Government Action.   Any government authority takes action that the Lender believes materially adversely affects the Debtors' financial condition or ability to repay the Loan.

(j)     Default under Related Documents.   Any default occurs under the Note, any security agreement or other document required by or delivered in connection with this Agreement or any such document is no longer in effect.

(k)     Other Breach Under Agreement.   A default occurs, after giving effect to any applicable cure period, under any other material term or condition of this Agreement not specifically referred to in this Article.

**7.2     Remedies.**

(a)     Upon the occurrence and during the continuance of any Event of Default, the Lender may do one or more of the following without prior notice: declare the Debtors in default, stop making any additional credit available to the Debtors, and require the Debtors to repay their entire debt immediately.  In addition, upon the occurrence and during the continuance of any Event of Default, the Lender shall have all rights, powers and remedies available under any instruments and agreements required by or executed in connection with this Agreement, the Loan Documents and the Financing Order, as well as all rights and remedies available at law or in equity.  Notwithstanding anything to

the contrary herein, the Lender shall provide the Debtors with written notice of an existing default or Event of Default, and Borrower shall have a ten (10) business day opportunity from the date such notice is received to cure a default or Event of Default prior to the Lender accelerating the balance due or taking any other remedies available to the Lender. After the occurrence and during the continuance of an Event of Default, the Lender may accept any payments from the Debtors without prejudice to the rights and remedies of the Lender provided herein or in the DIP Loan Documents and may seek relief from the automatic stay to enforce any or all of its rights, remedies, privileges, and benefits under the DIP Loan Documents including but not limited to the right to foreclose the DIP Liens on the DIP Collateral. In connection with any such motion, the Debtors agree shall not oppose any motion seeking an expedited hearing.

(b) All of the Lender's rights to exercise remedies hereunder are subject to the terms of the Financing Order.

## 8. ENFORCING THIS AGREEMENT; MISCELLANEOUS

**8.1 Governing Law.** Except to the extent that any law of the United States may apply, this Agreement shall be governed and interpreted according to the laws of the State of Connecticut (the "Governing Law State"), without regard to any choice of law, rules or principles to the contrary. Nothing in this paragraph shall be construed to limit or otherwise affect any rights or remedies of the Lender under federal law.

**8.2 Venue and Jurisdiction.** The Debtors agree that any action or suit against the Lender arising out of or relating to this Agreement shall be filed in federal court or state court located in the Governing Law State. The Debtors agree that the Lender shall not be deemed to have waived its rights to enforce this section by filing an action or suit against the Debtors in a venue outside of the Governing Law State. If the Lender does commence an action or suit arising out of or relating to this Agreement, the Debtors agree that the case may be filed in federal court or state court in the Governing Law State. The Lender reserves the right to commence an action or suit in any other jurisdiction where the Debtors or any Collateral have any presence or is located. The Debtors consent to personal jurisdiction and venue in such forum selected by the Lender and waives any right to contest jurisdiction and venue and the convenience of any such forum. The provisions of this section are material inducements to the Lender's acceptance of this Agreement. Notwithstanding the foregoing, Lender acknowledges that it may not take any action against the Debtors or their assets without prior Bankruptcy Court approval.

**8.3 Successors and Assigns.** This Agreement is binding on the Debtors' and the Lender's successors and assignees. The Debtors agree that it may not assign this Agreement without the Lender's prior consent.

**8.4 Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING**

DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.

**8.5    Severability; Waivers.** If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced. The Lender retains all rights, even if it makes a loan after an Event of Default. If the Lender waives a default or Event of Default, it may enforce a later default or Event of Default. Any consent or waiver under this Agreement must be in writing.

**8.6    Expenses.**

(a)    The Debtors shall pay to the Lender immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees, expended or incurred by the Lender in connection with (i) the negotiation and preparation of this Agreement and any related agreements, the Lender's continued administration of this Agreement and such related agreements, and the preparation of any amendments and waivers related to this Agreement or such related agreements, (ii) filing, recording and search fees, and other fees with respect to the Collateral, (iii) the Lender's costs or losses arising from any changes in law which are allocated to this Agreement or any credit outstanding under this Agreement, and (iv) reasonable costs or expenses required to be paid by the Debtors that are paid, incurred or advanced by the Lender.

(b)    The Debtors will indemnify and hold the Lender harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly out of (i) this Agreement, the Note or any document required hereunder, (ii) any credit extended or committed by the Lender to the Debtors hereunder and under the Note, and (iii) any litigation or proceeding related to or arising out of this Agreement or the Loan Documents.

(c)    The Debtors shall reimburse the Lender for any reasonable costs and attorneys' fees incurred by the Lender in connection with (i) the enforcement or preservation of the Lender's rights and remedies and/or the collection of any obligations of the Debtors which become due to the Lender and in connection with any "workout" or

restructuring, and (ii) the prosecution or defense of any action in any way related to this Agreement or the Loan Documents.

**8.7    One Agreement.**  This Agreement and the Loan Documents collectively: (a) represent the sum of the understandings and agreements between the Lender and the Debtors concerning the Loan; (b) replace any prior oral or written agreements between the Lender and the Debtors concerning the Loan; and (c) are intended by the Lender and the Debtors as the final, complete and exclusive statement of the terms agreed to by them.    In the event of any conflict between this Agreement and any other agreements required by this Agreement, this Agreement will prevail.

**8.8    Notices.**  Unless otherwise provided in this Agreement or in another agreement between the Lender and the Debtors, all notices required under this Agreement shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Agreement, or to such other addresses as the Lender and the Debtors may specify from time to time in writing.  Notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, or (ii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered.

**8.9    Headings.**  Article and paragraph headings are for reference only and shall not affect the interpretation or meaning of any provisions of this Agreement.

**8.10    Counterparts.**  This Agreement may be executed in as many counterparts as necessary or convenient, and by the different parties on separate counterparts each of which, when so executed, shall be deemed an original but all such counterparts shall constitute but one and the same agreement. Delivery of an executed counterpart of this Agreement (or of any agreement or document required by this Agreement and any amendment to this Agreement) by telecopy or other electronic imaging means shall be as effective as delivery of a manually executed counterpart of this Agreement; provided, however, that the telecopy or other electronic image shall be promptly followed by an original if required by the Lender.

**8.11    Financing Order.** The terms and conditions hereunder and under the Loan Documents shall be subject to the terms and conditions of the Financing Order. In the event of any inconsistency between the terms or conditions of this Agreement (or any Loan Document) and the terms and conditions of the Financing Order, the terms and conditions of the Financing Order shall control.

**8.12    Limitation of Interest and Other Charges**.  If, at any time, the rate of interest, together with all amounts which constitute interest and which are reserved, charged or taken by the Lender as compensation for fees, services or expenses incidental to the making, negotiating or collection of the loan evidenced hereby, shall be deemed by any competent court of law, governmental agency or tribunal to exceed the maximum rate of interest permitted to be charged by the Lender to the Debtors under applicable law,

then, during such time as such rate of interest would be deemed excessive, that portion of each sum paid attributable to that portion of such interest rate that exceeds the maximum rate of interest so permitted shall be deemed a voluntary prepayment of principal.  As used herein, the term "applicable law" shall mean the law in effect as of the date hereof; provided, however, that in the event there is a change in the law which results in a higher permissible rate of interest, then this Agreement shall be governed by such new law as of its effective date.

**8.13   Conversion of DIP Loan.**  The Lender is prepared to convert the entire balance of the Loan into a post-confirmation loan to the Debtors that is *pari passu* with the Debtors' pre-petition loan to the DECD in exchange for a majority interest in the reorganized Debtors on terms and conditions satisfactory to the Lender in its sole and absolute discretion.

**[Signatures to Appear on the Following Page]**

The Debtors executed this Agreement as of the date stated at the top of the first page, intending to create an instrument executed under seal.

DEBTOR:                                LENDER:

Back9Network Inc.                      Golf Works LLC


By_____             By_____
Typed Name_____              Typed Name_____
Title_____            Title_____


Swing by Swing Golf, Inc.


By_____
Typed Name_____
Title_____

-16-